## THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| IN *RE* MOTION TO COMPEL DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE AND MEDICAID SERVICES TO COMPLY WITH SUBPOENA FOR RECORDS | |
| Mile High Healthcare Analytics, LLC, | **MISC. CASE NO.:** |
| 2373 Central Park Blvd., Suite 100 Denver, CO 80238, | **Oral Argument Requested** |
| Movant, v. | |
| U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services, | |
| Office of the General Counsel 200 Independence Ave, S.W. Washington, D.C. 20201, | |
| Third-Party Non-Movant. | |
| Mile High Healthcare Analytics, LLC, | |
| Plaintiff, | |
| v. | |
| Medical Care Consortium Inc., Medical Care Consortium, LLC, MCCI Group Holdings, LLC, MCCI Holdings, LLC, Conviva Care Solutions, LLC, and Humana Inc., | **No. 1:18-cv-22374-DPG Pending in the Southern District of Florida** |
| Defendants. | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO COMPEL THIRD-PARTY DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE AND MEDICAID SERVICES, TO COMPLY WITH A SUBPOENA TO PRODUCE RECORDS

### PRELIMINARY STATEMENT

Movant, Mile High Healthcare Analytics, LLC ("Mile High" or "Plaintiff"), by and through its attorneys, **FRIER & LEVITT, LLC**, moves this Court for an order compelling third-party Department of Health and Human Services, Centers for Medicare and Medicaid Services ("CMS") to comply with a subpoena *duces tecum*, served upon it on February 27, 2019, which subpoena (the "Subpoena") seeks records relevant to the matter of <u>Mile High Healthcare Analytics, LLC v. Medical Care Consortium Inc. et al</u>, Dkt. No.: 1:18-cv-22374-DPG, currently pending in the Southern District of Florida (the "SDFLA Action"), by producing all records demanded therein. A true and accurate copy of the Subpoena is attached to the Certification of Jonathan E. Levitt, Esq., filed herewith, as <u>Exhibit</u> 1. The SDFLA Action concerns a contract entered into between Mile High and one or more of the Defendants, wherein Mile High was tasked with identifying and submitting tranches of Medicare Advantage risk adjustment data to Defendants, and Defendants, in turn, were to submit this data to CMS for reimbursement through the Medicare Program, and, finally, to pay Mile High a percentage of the increased premium revenues Defendants received from CMS resulting from Mile High's work. Mile High performed under the contract, identifying and submitting millions of dollars' worth of Medicare Advantage risk adjustment data to Defendants; however, the Defendants failed or refused to make payment, to advise whether payment was ever received from CMS, or to even provide data/documentation justifying nonpayment, despite Mile Having made request for such data/documentation well in advance of the filing of the SDFLA Action.

The records sought through the Subpoena's 15 individual "Production Requests" go to the heart of the SDFLA Action's claims and controversies, as they call for the production of data that will illuminate whether, when and how much of the data provided by Mile High to the Defendants

was submitted by the Defendants to CMS and whether, when and how much in the way of increased capitated payments were paid by CMS to one or more of the Defendants as a result of Mile High's work pursuant to the aforementioned contract.

Despite Plaintiff's repeated and good faith efforts to work with Defendants and CMS to avoid having to file this Motion, and despite there being both a HIPAA Qualified Protective Order ("HQPO"), Exhibit 2 to Levitt Cert., and an Agreed Confidentiality Order and Protective Order ("Protective Order"), Exhibit 3 to Levitt Cert., applicable to all records produced in discovery in the SDFLA Action already in place (collectively, the "Protective Orders"), CMS and one of the Defendants in the SDFLA Matter – Humana Inc. ("Humana") – have objected to the Subpoena on multiple grounds, including burdensomeness, relevance and certain purported Privacy Act, 5 U.S.C. 552a, prohibitions on disclosure. The objections raised by CMS (the "CMS Objections") are impermissibly boilerplate and should be overruled or deemed waived as such. Humana's objections ("Humana Objections") were not properly raised in the first instance, as it plainly lacks standing to object or move to quash a subpoena served on CMS and, even if it were to have standing, the relief Humana seeks would be entirely gratuitous since the Protective Orders are already in-force, providing more than sufficient safeguards for the records at issue.

For these reasons and those that follow, Plaintiff respectfully requests for the entry of an Order compelling CMS to comply with the Subpoena.

## JURISDICTION

The court has jurisdiction to compel CMS' compliance with the Subpoena pursuant to F.R.C.P. 45(c)(2)(A), 45(d)(2)(i) and 37(a)(2), because the Subpoena was served, in accordance with 45 C.F.R. § 4.2, upon CMS at the "Department of Health and Human Services, Centers for Medicare and Medicaid Services, Office of Legal Resources, Office of General Counsel, 200

Independence Avenue, SW, Room 700E, Washington, D.C. 20201" without objection[1] from CMS; because the place of compliance listed on the Subpoena is located within the District of Columbia; and because the District Court for the District of Columbia sits within 100 miles of where CMS resides or regularly transacts business.

### SUMMARY OF FACTS AND PROCEDURAL HISTORY[2][3]

### Introductory Summary to the SDFLA Action

Mile High, a highly sophisticated data analytics firm, was retained by one or more of the defendant MCCI Entities – consisting of MCCI Holdings, LLC, MCCI Group Holdings, LLC, Medical Care Consortium, LLC and Medical Care Consortium Inc.[4] – to perform an audit of the MCCI Entities and Humana's Medicare Advantage[5] data and data intake/processing procedures and methods, in addition to seeking out and identifying encounter data containing diagnosis codes overlooked by the MCCI Entities and Humana, which if timely submitted to CMS would result in increased capitation revenues for those companies. See Ex. 4 to Levitt Cert. (First Amended Complaint ("FAC")) at ¶11.

The contract under which Mile High was retained was structured principally as a "gainshare" or contingency fee arrangement, whereby Mile High would be entitled to a percentage of the increased premium revenues received by the MCCI Entities, if such revenue increases were attributable to Mile High's identification of additional valuable Medicare Advantage data points.

---

[1] As to service.

[2] The factual allegations set forth herein have, except where otherwise indicated, been pulled from the First Amended Complaint filed in the SDFLA Action.

[3] In addition to the facts set forth in this Section, Plaintiff incorporates by reference all factual allegations and Exhibits set forth in the Certification of Jonathan E. Levitt and the Declaration of Richard Lieberman, filed herewith.

[4] It is as yet unclear whether the other defendants – Humana Inc. and Conviva Care Solutions, LLC – were also or should also be deemed signatories to this contract, and Plaintiff reserves its rights to address this issue in the SDFLA Action, notwithstanding anything stated herein.

[5] As discussed below, the data at issue, in a sense, derives from both MCCI and Humana.

Id. at ¶12. Mile High completed the audit and identified *millions of dollars* in additional Medicare Advantage data, from which, upon information and belief, both the MCCI Entities and Humana did or could have benefitted. Id. at ¶13.

Before and during the pendency of the contract at issue in the SDFLA Action, Humana sought to acquire a controlling interest in the MCCI Entities for a sizeable sum. Id. at ¶14.  Upon information and belief, to appease Humana and ensure the success of the acquisition, the MCCI Entities purposefully delayed payment, withheld data and, ultimately, refused to pay Mile High the gainshare monies it had earned. Id. Upon further information and belief, Humana desired this result because it feared validating Mile High's audit results, which, in part, reflected that substantial and highly valuable tranches of Medicare Advantage data were lost by Humana due to its antiquated, inefficient and poorly managed Medicare Advantage data intake systems and risk adjustment processing procedures and equipment – glaring flaws that could subject Humana to untold millions in liability from other entities with which it is contracted to process and make payments under the Medicare Advantage program. Id. Ultimately, Humana did acquire the MCCI Entities and Mile High remains entirely unpaid in gainshare for the services performed. Id.

### *The Medicare Advantage Program and Risk Adjusted Capitated Payments*

To more readily understand the nature of the Parties in the SDFLA Action and of the controversy at its center, a very brief explanation of the Medicare Advantage program and the capitated payment system relating thereto is warranted. In 1965, President Johnson signed into law Health Insurance for the Aged Act ("Act" P.L. 89-97).  Title I of the Act created the Medicare program, 42 U.S.C. 1395-1395ggg, through which medical insurance is provided for and/or administered by CMS for the aged and disabled. From its inception in 1966 to the present, "Original" Medicare paid physicians and hospitals on a fee-for-service basis. Medicare Advantage,

or Medicare Part C, 42 U.S.C. 1395w-21 – w-28, is a federal program that allows eligible individuals to elect to receive all Medicare Part A/B benefits directly from a private health plan. 42 U.S.C. 1395w-21 – w-22. Roughly over one-third of all current Medicare beneficiaries are enrolled in this program. Levitt Cert. at Ex. 4, ¶17.

Under Medicare Advantage, in lieu of fee-for-service, CMS pays such plans, designated as "Medicare Advantage Organizations" ("MAO"), a monthly, capitated fee for each Medicare Advantage plan enrollee.   42 U.S.C. 1395w-21 – w-24.   The capitation arrangement is memorialized by way of comprehensive contract entered into between the MAO and CMS.  42 U.S.C. 1395w-27. Because the MAO receives the same capitated payment regardless of the number of times an enrollee requires or accesses care, the capitated payment to the MAO must, from time to time, be adjusted to match the shifting "risk" associated with the enrollee, which may increase or decrease depending on a wide array of factors evaluated by CMS, such as the number and types of diagnosis codes submitted by the MAO to CMS for the enrollee over a given time period. Levitt Cert. at Ex. 4 at ¶19-20. In laymen's terms: the sicker and/or older the patient, the greater his or her risk or expectation of requiring additional medical care and, thus, the higher the monthly capitated payment warranted. Id. at ¶21.

Diagnosis codes, reported by physicians and hospitals, are the primary data used to determine how sick a Medicare Advantage enrollee is for risk adjustment purposes. Id. at ¶20. It is for this reason that the SDFLA recently stated: "risk-adjustment data provides the foundation for payment under Medicare Advantage[.]" Graves v. Humana, Inc. et al., 281 F.Supp.3d 1260, 1264 (S.D.FL. 2017). It is for this same reason that, within the Medicare Advantage arena, the efficient and accurate capture of relevant risk adjustment data for enrollees, such as diagnosis codes, is worth its weight in gold.

MAOs, such as Humana, frequently contract with third-party "downstream" provider groups, including Management Service Organizations and Medical Services Organizations ("MSO"), such as the MCCI Entities, who provide or administer the provision of the medical care covered by the MAO plan to the enrollee ("First Tier Entities").  42 C.F.R. 422.2. As is the case here, the MAO may pay the First Tier Entity on a capitated per member per month basis. Levitt Cert. at Ex. 4, ¶23-24. Although "downstream" from the MAO, the First Tier Entity transmits encounter data for the beneficiaries attributed to it "upstream" to the MAO. Id. at ¶24. The MAO, in turn, evaluates, aggregates and packages that data for further upstream delivery to CMS' Risk Adjustment Suite of Systems, where capitation rates are determined, adjusted as appropriate and paid to the MAO for the same. Id. at ¶25.

This continuous upstream transmission of Medicare Advantage enrollee healthcare data is effectuated using a specific payment form or format, known as a Risk Adjustment Payment System ("RAPS") data file. Id. at ¶26. A RAPS data file must contain certain data elements for an enrollee over a given time period to be valid, including the beneficiary identifier, the provider type, the "from date of service," the "through date of service," and up to 10 diagnosis codes. Id. RAPS files are initially uploaded to CMS' Front End Risk Adjustment System ("FERAS"), where the files are processed, evaluated for errors and effectively repackaged and submitted to CMS' Risk Adjustment Processing System ("RAPS System"). Id. at ¶27. The RAPS System further evaluates the diagnosis cluster data from FERAS for errors, beneficiary eligibility, and diagnosis code validity, and then generates a number of reports that are electronically forwarded to the MAO for review. Id. From the RAPS System, the finalized diagnosis cluster data is forwarded to the CMS Risk Adjustment Processing Database ("RAPS Database") where it is housed for subsequent processing by CMS' Risk Adjustment System ("RAS"), which is the program that actually applies

or executes the risk adjustment model to the data and calculates a risk score, which, in turn, results in an adjusted capitation rate for the enrollee from whom the diagnosis cluster data was derived. Id. at ¶28.

RAPS data files are one of two means by which CMS collects diagnosis codes used in the computation of risk scores and the annual adjustment of capitation rates. Id. at ¶29. Since 2012, MAOs have been required to submit comprehensive encounter data, with many more data elements than are required by the RAPS system, to the Encounter Data Processing System ("EDPS"). Id. And, since 2016, CMS has blended data from EDPS with data from the RAPS system to determine MAOs' risk scores and capitation payments. Id.

It is important to clarify that while Medicare Advantage capitation rates are adjusted annually for every Medicare beneficiary enrolled in an MAO, the adjustment is based on the diagnosis codes documented by physicians and hospitals from the prior calendar year. Id. at ¶30. Hence, Payment Year 2018 capitation rates are based on diagnosis codes linked to services rendered to Medicare beneficiaries in calendar year 2017.

## Background to Dispute

The MCCI Entities were, up through on or about March 31, 2018, privately held medical services organizations headquartered in Miami, Florida, which administered numerous physician practices, catering to thousands of Floridians – virtually all of whom were Medicare Advantage enrollees. Id. at ¶32. Prior to their acquisition by Humana, the MCCI entities – Medical Care Consortium Inc., Medical Care Consortium, LLC, MCCI Holdings, LLC and MCCI Group Holdings, LLC – were all located in the same building (4960 SW 72nd Avenue, Miami, Florida) and under the direction and ownership of the same principal, Dr. Jose Armas. Id. at ¶33. On or about March 31, 2018, Humana acquired some or all of the MCCI Entities. Id. at ¶34.

Prior to 2012, Humana considered MCCI to be a "direct competitor[] in the [provider services network] industry . . ."  On or about October 29, 2012, Humana acquired a noncontrolling equity interest in MCCI.  The agreement entered into between Humana and MCCI "include[d] a put option that would allow the controlling interest holder to put their interest to [Humana] beginning in 2018 as well as a call option . . ." Id. at ¶35. The terms and conditions of the deal are not public. Id.

On or about June 14, 2017, MCCI and MHHA executed a work order (retroactive to January 9, 2017) – "Work Order No. 2[,]" given the project name "Identification and Resubmission of Missing Management Data" (hereafter the "Gainshare Agreement"). Id. at ¶42 see also Ex. 5 to Levitt Cert. (Gainshare Agreement at 1). The services to be performed under the Gainshare Agreement included, among other things, Mile High's "correction of MCCI's Incorrect Management Data and . . . [to] assist [MCCI] in submitting the correct applicable Management Data to the Payer . . ."  The Gainshare Agreement defines "Management Data" to mean "Data entered into [MCCI's] practice Management System and its derivatives using . . . diagnosis and procedure codes . . . to describe the patient's illness burden and services rendered." Id.

In essence, the Gainshare Agreement called upon Mile High's expertise to evaluate, correct and identify new Medicare Advantage risk adjustment data. Id. at ¶43. Under the terms of the Agreement, such corrected/additional data was to be submitted to Humana, who, in turn, was to submit it to CMS, in order to retroactively increase capitation payments, or, as described by the contract, to cause the payment of "Incremental Premium Revenue[,] which is "[a]dditional Premium Revenue received by Client, solely as a direct result of Services provided by [Mile High] under, or related to, this Work Order." Id. Consistent with the above-described Medicare Advantage data processing cycle, the raw data to be evaluated was generated by the MCCI Entities,

Humana and/or CMS, and included but were not limited to "RERAP files that contain data extracted from the CMS RAPS return files [containing] . . . error [ and diagnosis] codes as to why conditions may not have been accepted by CMS[,] . . . encounter and claims data for members assigned to a MCCI primary care provider (REENCNTR, RECLMEXP, and RECLMDSP file[s])[,] REMOR data file[s] which provide[] basic Humana information along with data from the CMS MOR (Model Output Report File[,]" among others. Id. at ¶44.

The Gainshare Agreement contained a "Gainshare Compensation" component, which was effectively a contingency fee arrangement, the principal purpose of which was to compensate Mile High for the "Incremental Premium Revenue," i.e., increased capitation payments, received by MCCI as a result of Mile High's efforts. Id. at ¶45, 47. Indeed, Paragraph 10 to the Agreement plainly states that "[t]he *primary purpose of this Agreement* is to ensure risk score accuracy by way of submission of Management Data [and i]n the event that [Mile High's] efforts result in Incremental Premium Revenue, then, and in that event, Company shall be entitled to a Gainshare[.]" (emphasis added). Id. The Gainshare Compensation component applied to discreet data evaluation tasks, including: (i) the "Gap Analysis-PY2016 Post-Final for Reconciliation" Submission ("January 2017 Submission"), (ii) the "Gap Analysis-PY2016 March Submission" ("March 2017 Submission"), (iii) the "Gap Analysis-2017 September Submission" ("September 2017 Submission"), and (iv) the January 2018 Submission Gainshare ("January 2018 Submission") (collectively, "Gainshare Submissions"). Id. at ¶49. The January 2017 and March 2017 Submissions paid a 25% gainshare, and the September 2017 and January 2018 Submissions paid a 20% gainshare. Id.

The Gainshare Agreement clarifies that the Gainshare Submissions must be reviewed and approved by the MCCI Entities prior to their submission to Humana and/or CMS. Id. at ¶50.

Consistent with Agreement, Mile High reasonably expected that the MCCI Entities would, in fact, review and approve (in whole or in part) the Gainshare Submissions submitted and, if not, that the MCCI Entities would provide Mile High with reasonable regulatory and/or technical reasons for declining to do so. Id. at ¶51. Notably, the Gainshare Agreement further contains a provision granting Mile High the right to audit MCCI once each calendar year. Id. at ¶53.

Mile High began to perform its work under the Gainshare Agreement straight away, combing through reams of computerized data files, conducting interviews, and even performing several "on-site" MCCI Entity visits to evaluate the relevant Medicare Advantage data at issue and to determine whether other new, identifiable and appropriate Medicare Advantage data could be submitted to Humana/CMS. Id. at ¶57. Because Humana, as the MAO, submitted the Medicare Advantage data files to CMS, most of the data files reviewed were Humana-generated (purported) extracts of standard CMS data files produced by Humana in response to the company's previous data submissions (e.g., RAPS files, Model Output Report files, Monthly Membership Report data files, etc.) or were Humana-generated extracts from Humana's own claims or encounter files. Id. at ¶58. For this reason, Mile High, from about January 2017 through February 2017, often corresponded with Humana directly. Id.

In reviewing the Humana data, it became quickly apparent to Mile High that Humana's Medicare Advantage data intake and submission methods and procedures had significant systemic issues that caused it to routinely fail to capture data, such as diagnosis codes, that would have otherwise resulted in incremental premium revenues. Id. at ¶59. Upon information and belief, as Mile High conducted its work under the Gainshare Agreement and communicated examples of the above to the MCCI Entities, the MCCI Entities, in turn, communicated them to Humana. Id. at ¶64. On Information and belief, Humana recognized that if Mile High's findings and conclusions

were to be validated, it may subject Humana to enormous legal and financial exposure from other inadequately compensated providers contracted with it. Humana, therefore, upon information and belief, began to bring pressure to bear on the MCCI Entities to ensure that this did not happen. Upon information and belief, at the time, the MCCI Entities were extremely eager to effectuate the potential and still pending acquisition by Humana and were therefore willing to play ball. Id.

Upon information and belief, as a result of Humana and the MCCI Entities' collusion, beginning in or around March 2017, Mile High began to receive strange and unjustified pushback from the MCCI Entities and Humana when submitting new tranches of risk adjustment data or requesting data/information relating to the same. Id. at ¶65. Indeed, Humana at first outright refused to submit most of the initial Submissions prepared by Mile High to CMS, without providing any sensible business or regulatory reason for doing so – even after Mile High immediately provided data addressing the (nonsensical) justifications given for non-submission. Id. Receipt of this data by Defendants was met with new, equally vacuous reasons for non-submission. Id.  In good faith, Mile High requested that Humana and/or the MCCI Entities provide documentation supporting the assertions made for non-submission – to date, Humana and the MCCI Entities have provided *nothing*. Id.; see also Levitt Cert. at ¶7. As weeks turned into months, the MCCI Entities requested that Mile High cease communications with Humana. Id. at ¶66. The MCCI Entities continued to provide nonsensical responses (or no response) to the question of whether any of the Submissions had been submitted by Humana to CMS – sometimes asserting that they "might have" been submitted and that Humana was awaiting the results. Id.

Despite MCCI and Humana's conduct, the Gainshare Agreement had not been terminated by either party. Id. at Ex. 4, ¶67. As such, Mile High proceeded to fully perform under the Agreement, providing the MCCI Entities with the January 2017, March 2017, September 2017,

and January 2018 Submissions. Id. The Gainshare Submissions reflected that Mile High had found a very substantial number of missing encounter data that had resulted in lost revenues, and corrected and/or identified additional data that did or could have resulted in ***millions of dollars'*** worth of incremental premium revenue if timely submitted to CMS by Humana. Id. On or about November 15, 2017, Mile High invoiced MCCI for the September 2017 Submission. Id. at ¶68. The invoice requested $1,069,307.00 in estimated gainshare as a percentage of the incremental premium revenues received by the MCCI Entities resulting from Mile High's work. Id.

On or about February 4, 2018, Mile High formally invoiced MCCI for the March 2017 and January 2018 Submissions. Id. at ¶76. For the March 2017 Submission, Mile High requested payment of a gainshare with a then-estimated value of $1,087,860. Id. For the January 2018 Submission, Mile High requested payment of a gainshare with a then-estimated value of $1,800,000.00. Id. Mile High was unable (and continues to be unable) to invoice MCCI for the January 2017 Submission because MCCI repeatedly ignored or refused Mile High's requests for the data necessary to calculate the attendant gainshare. Id. at ¶77; see also Levitt Cert. at ¶7.

Several weeks later, Humana "acquired the remaining 51% interest in MCCI and officially launched Conviva, bringing together [its] fully-owned and JV primary care assets in South Florida and Texas under one brand and one management team." Id. at ¶79. On April 13, 2018, Mile High received email confirmation from both Humana and the MCCI Entities that Humana was in the process of submitting the data supplied by Mile High. Id. at ¶81. However, as was the norm, no further information about the results of the data submission was provided to Mile High by either the MCCI Entities or Humana, despite repeated requests from Mile High for the same. Id.

On or about April 27, 2018, Mr. Valverde, an MCCI VP Entity with whom Plaintiff had been corresponding, had a teleconference with Mile High's management, in which he revealed,

for the first time, that MCCI had been acquired by Humana. <u>Id.</u> at ¶78, 82. Mr. Valverde further advised that he had been converted from an officer to a mere "consultant" for the MCCI Entities and no longer had "signing authority" with regard to the Gainshare Agreement. <u>Id.</u> Instead, at best, he could "recommend" to "Humana" that it comply with the Gainshare Agreement. <u>Id.</u> Given the history between the Parties, it was evident that the MCCI Entities/Humana would not be paying Mile High the gainshare earned under the Agreement or providing Mile High with data justifying this nonpayment. <u>Id.</u> at ¶84. To enforce its rights under the PSA and the Gainshare Agreement, Mile High therefore retained counsel. <u>Id.</u> On April 29, 2018, through counsel, Mile High presented a demand letter to MCCI/Humana ("Demand Letter"). <u>Id.</u> at ¶85. In the Demand Letter, Mile High demanded that MCCI/Humana make payment under the Gainshare Agreement, formally invoked its audit rights under the Agreement, and made a series of data/document demands to determine: whether Humana had ever submitted the data contained in the Gainshare Submissions to CMS and, if so, whether all or a part of that data had been submitted, and how much revenue Humana and the MCCI Entities had received as a result. <u>Id.</u> By way of email dated May 2, 2018, in-house counsel for "Humana Inc. and its subsidiaries, including MCCI[,]" responded to the Demand Letter. <u>Id.</u> at ¶87. None of the Demand Letter's requested documentation or data was provided, nor was any indication given that it would be. <u>Id.</u> In corresponding with Humana/MCCI, Mile High reiterated its demand that documents relevant to the gainshare dispute be produced pursuant to the Gainshare Agreement's audit provision; however, Humana/MCCI refused. <u>Id.</u> at ¶91. Because Humana/MCCI has not, to date, responded to Mile High's document and information requests, Mile High has no knowledge of whether or what portion of the Gainshare Submission data has been submitted to CMS or whether, if submitted, the submission was timely. <u>Id.</u> at ¶92; <u>see</u> <u>also</u> <u>Levitt Cert.</u> at ¶7.

Shortly thereafter, on June 13, 2018, the SDFLA Action was filed on the basis of the above-described fact pattern. Levitt Cert. at ¶8. Later, on September 7, 2018, the initial Complaint was amended. Among the Counts included in the currently filed First Amended Complaint (the "FAC") are: breach of the Gainshare Agreement's gainshare compensation provision, breach of the Agreement's audit provision, fraudulent inducement, unjust enrichment and tortious interference. Id.

## Background to the Discovery Dispute and Entry of the Protective Orders

In or around January of this year, the Parties began negotiating the terms of the HQPO and the Protective Order. Levitt Cert. at ¶9. On January 15, 2019, the HQPO, covering "[a]ll documents and materials . . . including all Discovery Material . . . produced in the course of discovery in this case[,]" was submitted to the court for filing and issued on the same day. Id. On or about January 28, 2019, counsel for Plaintiff emailed to opposing counsel a red-lined draft proposed Protective Order, which included Plaintiff's addition of an "HHS Exception," which provided that the Protective Order would not be applicable to records produced by CMS. See Id. at ¶10, Ex. 2.

On or about February 19, 2019, during a teleconference between counsel for the Parties concerning the drafting of the Protective Order, the "HHS Exception" was discussed, with respect to which Plaintiff advised Defendants of its intention to serve the Subpoena on CMS if Humana would not produce the records sought therein. Levitt Cert. at ¶12. To this end, Plaintiff emailed a draft of the Subpoena and a letter intended to accompany it ("Letter to CMS") to opposing counsel on February 20, 2019, advising in the email that Plaintiff would "refrain from serving CMS with the attached if Humana will provide it with written assurances (an email will do) that it will provide the records sought therein . . .". Id. at ¶13, Ex. 7. The email clarified, however, that Plaintiff had instructed counsel that service on CMS would proceed if no such written assurances were received by "5:00 PM (EST) this coming Tuesday, February 26, 2019." Id. at Ex. 7. On or about February

25, 2019, counsel for Plaintiff and Humana discussed the Subpoena by phone, during which call, as memorialized in an email sent later that day, counsel for Humana advised: "I am not able to promise anything at this point, but I spoke with my client about possibly providing relevant 'Raps return files[,] . . . reflect[ing] the codes Humana submitted and CMS' adjudication of the code . . . I would request . . . that you hold off on serving CMS . . . until Friday, March 1, 2019, so I can fine-tune the proposal with my client." Id. at ¶14, Ex. 8.

In response to the foregoing, Plaintiff emailed counsel for Humana the following day, declining Humana's offer (which was, in reality, a non-offer, as counsel expressly qualified that he was unable "to promise anything"), and explaining in great depth why the proposal was a non-starter, noting that "the CMS Subpoena is substantially broader in scope than the RAPS return files[,]" that the RAPS data, "taken alone, provide[s] no financial information whatsoever[, n]or do these files indicate which Mile High identified risk adjustment data, such as Hierarchical Condition Category codes ("HCCs") CMS accepted from and credited to Humana. Nor will they reflect premium amounts generated/received." Id. at Ex. 9. Plaintiff further responded by noting that Humana's "offer" did "not include a promise to produce Model Output Reports (MOR), Monthly Membership Reports (MMR) or Encounter Data Processing System (EDPS) data files[, which] . . . contain the data from which the amount of incremental premium revenue deriving from the Gainshare Submissions received by Humana/the MCCI Entities may be calculated." Id. Finally, Plaintiff noted that the "offer" of RAPS Return files was an illusory one, since Humana indicated it intended to unilaterally pre-subset the data, i.e., it would remove non-MCCI attributed members from the data pool, without providing any

> native CMS file types (requested in the CMS Subpoena), that would allow for cross-verification, such as the RAPS Cumulative Plan Activity Reports, which Reports would allow Mile High to cross-check the total record count of RAPS files both rejected and accepted by CMS as against the pre-selected/subsetted RAPS

> return files (potentially) offered by [Humana,] . . . which would preclude Humana's
> ability to cherry-pick data to fit its narrative . . . [These files, taken alone, would be
> the effective equivalent of the 'RERAP' Humana-created file types previously
> provided to Mile High for purposes of performing the audit called for under the
> Gainshare Agreement[, which were found] . . . to be enormously inaccurate . . .

Id. Humana never substantively responded to the above (nor did any other Defendant) and, as such,

Plaintiff proceeded to serve the Subpoena on CMS, effectuating the same on February 27, 2019.

See id. at ¶16, Ex. 10. Along with the Subpoena itself, Plaintiff served CMS with the Letter to

CMS, a copy of the FAC, and a copy of the HQPO. See id. at Ex. 11, at 1.

Importantly, the Letter to CMS underscored to the agency that its "principal purpose . . .

[wa]s, to the greatest extent practicable, lessen the agency burden the records requested contained

in the [S]ubpoena . . . may cause CMS by (1) providing the agency with added detail as to the

nature of the records sought; (2) explaining in brief the records' centrality to the resolution of the

Action; (3) describing Mile high's unique ability to work with CMS to appropriately narrow the

scope of the requests; and (4) highlighting the potential significance the production of the records

sought may have vis-à-vis maintaining the integrity of the Medicare Trust Funds." Id. To

demonstrate good faith, the letter contained an entire, single-spaced page detailing how "Mile High

Is Willing and Uniquely Able to Work Collaboratively with CMS to Narrow the Scope of the

Production Requests." Id. at 4. Further, working under the (unfortunately incorrect) assumption

that CMS would welcome the opportunity to preemptively allay agency burden in responding to

the Subpoena, Mile High prepared and wrote proprietary computer code, which CMS could use to

quickly and efficiently pre-subset the data sought to accurately excise non-MCCI attributed

members from the data sets produced. Declaration of Richard Lieberman, filed herewith, at 22. On

March 13, 2018, the compliance date of the Subpoena, counsel for CMS sent a letter via email to

Plaintiff's counsel containing CMS' Objections, which included the following:

- *(1)* The Privacy Act "precludes release except pursuant to a . . . federal court order that directs the release of the records." *(2)* CMS "do[es] not know how to comply with this provision [concerning the applicability of Other Applicable Privacy Law to data received by subpoenaing party as set forth in Agreed HIPAA Qualified Protective Order] . . . without doing a line by line inspection of all of the medical data you have requested to determine whether the release is consistent with this provision. This creates an enormous undue burden on the agency as the review would be time-consuming and costly." *(3)* CMS "believe[s] that compliance with the subpoena is not practical within the time frames requested. [CMS] believe[s] that compliance would be costly and would be an undue burden on the agency." *(4)* CMS "believe[s] that Humana should be given an opportunity to object on the grounds that some of the information might be considered . . . proprietary."

<u>Levitt Cert.</u> at <u>Ex.</u> 12. On the same date, Plaintiff's counsel immediately responded to CMS by email, granting the agency its requested extension, pushing the date for compliance back to April 12, 2019, and requesting that counsel for the parties talk by phone to "work[] through some of the issues raised in your letter." <u>Id.</u> at <u>Ex.</u> 13. On March 27, 2019, counsel for the parties did, in fact, have a call, during which call Plaintiff again repeated the offer made in the Letter to CMS – that Mile High and CMS' data technicians discuss potential means of rapidly and efficiently producing the records requested to minimize agency burden. <u>Id.</u> at ¶20. Unfortunately, CMS resisted this suggestion, insisting that the question of efficiency not even be broached until an Order to disclose was secured. <u>Id.</u>

By way of email dated March 28, 2019, Humana provided a "very high-level overview of [its] objections to the [S]ubpoena[,]" which included the following:

- "[T[he subpoena['s] relevant time period . . . is overly broad, unduly burdensome, and calls for the productions of several years of information exchanged between Humana and CMS having nothing to do with the claims at issue in this litigation. The Gainshare Agreement has a retroactive effective date of January 9, 2017, and this case focuses on four discrete submissions to CMS between January 2017 through May 2018. Because the Gainshare Agreement did not even take effect until January 9, 2017 and the only relevant submissions occurred between that date and May 2018, other CMS submissions before and after those dates are not relevant to Mile High's claims. As a result, we request that you narrow the scope of the subpoena to include any information exchanged between Humana and CMS (and vice versa) prior to January 9, 2017 and after May 4, 2018."

- "[W]ith respect to Mile High's request for documents related to Contract Nos. H4510 and H5216[,] [t]hese contracts were not considered by Wakely and we do not believe that they are relevant to the gainsharing analysis that is at issue in this litigation. You have previously stated that Contract H5415 was merged into Contract H5216 and that Contract H4510 was consolidated into Contract H2649 on 1/1/2016. Given [your] . . . that both of these contracts were consolidated and/or merged into Contracts H5216 and H2649 well in advance of any of the submissions at issue, we see no relevance in seeking documents related to those contracts. Any information relevant to the submissions between January 2017 and May 4, 2018 would be contained in the materials related to Contracts H5216 and H2649."

- "[T]he individual production requests as seeking a vast amount of documents and information that have nothing to do with MCCI's patients or the claims at issue. Without getting into every individual requests [sic], several of the requests seek RAPS Return Files, RAPS Cumulative Plan Activity Reports, RAPS Transaction Error Reports, and RAPS Transaction Summary Reports for the Medicare Advantage contracts identified in the Subpoena. (*See, e.g.,* Production Requests Nos. 2-5) Compliance with these requests would result in the production of a huge range of Humana patient information and claims data having nothing to do with the MCCI claims information at issue in this litigation. Compliance with the requests as drafted would result in the production of risk adjustment, encounter data, and plan payment data files for thousands and thousands of Humana claims that have nothing to do with this litigation, MCCI, or Mile High."

Levitt Cert. at Ex. 14. By way of email dated April 4, 2019, Plaintiff's counsel provided a point-by-point rebuttal of the above objections, highlighting the central flaw inherent in each, namely, that the Medicare Advantage risk adjustment data intake process, by regulation, uses risk adjustment data from a given year to calculate capitated payments to be paid in the following year and, further, that the express terms of the Gainshare Agreement plainly span years 2015 through 2018. See id. at Ex. 15; see also, infra, at 40-42. Notably, Plaintiff's responsive email concludes by stating: "We are willing to further discuss the above in good faith should Humana be open to reconsidering – even in part – its current objections to the CMS Subpoena." Id. at Ex. 15. To date, Humana has not substantively responded to the issues raised in Plaintiff's April 4, 2019 email. Id. at ¶22.

By way of email dated April 11, 2019, the day before the extended Subpoena compliance deadline was set to expire, counsel for CMS stated: "The following should be considered to be additional objections to your subpoena. As we have previously discussed, we are waiting for an

Order from the court related to the Privacy Act and clarification regarding the production of records that have heightened privacy protection. After such an Order is obtained, we can discuss what can reasonably be produced by CMS without an undue burden and what documents that the defendant in this action may seek to claim are proprietary. Therefore, we will not be producing any documents this week." Id. at Ex. 16. In response, Plaintiff – yet a third time – attempted to secure more detail from CMS in order to address its concerns, stating: "Are you able to provide us with any specificity on the issue of burdensomeness? ***It seems to me that it would be sensible for CMS to provide us with some detail as to the basis for this objection now rather than addressing it for the first time in an Opposition to a Motion to Compel*** (should we need to file one). With detail as to the underlying reasons for the purported burdensomeness, we can work to potentially tailor a narrower set of requests or perhaps find[] a mutually agreeable solution that would lessen that burden. Kindly advise." Id. at Ex. 17 (emphasis added). By way of reply on April 15, 2019, CMS left no further room for doubt that it harbored no intention to cooperate in the discovery process, stating: "I will see if I can get you some more detail, but we need a new order form the Court before we can go forward." Id. at Ex. 18. To date, CMS has provided no follow-up and no additional detail whatsoever. Id. at ¶25.

All the while, Plaintiff and Humana had continued their work negotiating a mutually acceptable, agreed upon Protective Order. Id. at ¶26. And, on May 1, 2019, Defendants finally agreed to the "HHS Material" exception, which now provided that all information or documents produced by CMS in the course of discovery would be designated "Confidential Information" but it would not, under any circumstances, be designated "Confidential Attorneys Only" information, the latter of which (unlike the former) was defined to expressly include information the producing party's counsel "reasonably believes constitutes or contains a trade secret; would reveal

proprietary information, data, or methodologies . . . or would seriously undermine the producing party's competitive posture in . . . other business dealings . . ." Id. at Ex. 19; 3 at pp 1-2. Thus, even after being apprised of the Subpoena and its contents and debating them in depth with Plaintiff, Humana expressly agreed to allow Mile High direct access to CMS produced records and acknowledged that such records were non-proprietary in nature. On July 15, 2019, an (agreed) Motion for Entry of the Protective Order was filed and, on July 17, 2019, the executed Order was issued by the court. Id. at Ex. 3.[6]

## LEGAL ARGUMENT

### Point 1

### Plaintiff Has Satisfied The Legal Standard to Compel Compliance with a Subpoena Under F.R.C.P. 45.

Pursuant to F.R.C.P. 45(d), "[t]he party moving to compel production . . . [1] bears the initial burden of explaining how the requested information is relevant. Once that showing is made, however, the [2] burden shifts to the objecting party to explain why discovery should not be permitted." Jewish War Veterans of the U.S. of America, Inc. v. Gates, 506 F.Supp.2d 30, 42 (D.D.C. 2007). "This is a heavy burden." Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 403 (D.C. Cir. 1984).

In performing the first step of this process, "the court must consider whether the discovery sought is relevant to a party's claim or defense in the underlying litigation, as [relevance] is defined in Rule 26(b)(1)." Buzzfeed, Inc. et al. v. DOJ et al., 318 F.Supp.3d 347 (D.D.C. 2018); see also In re Denture Cream Prods. Liab. Litig., 292 F.R.D. 120, 123 (D.D.C. 2013). "Discovery obtained

---

[6] Plaintiff initially filed the Protective Order with the Court on May 10, 2019; however, it was not entered for reasons unknown. Upon inquiry with the presiding Judge's chambers, Plaintiff was advised that the Order would issue upon the filing of a Motion for Entry of Protective Order, which Motion was filed on July 15, 2019. See Levitt Cert. at ¶33; Ex. 24.

from a nonparty pursuant to Rule 45 has 'the same scope as provided in rule 26(b), thus promoting uniformity.'" In re Denture, 292 F.R.D. at 123 (quoting Advisory Committee Note to 1946 Amendment to Rule 45(d). Under a Rule 26(b) analysis, "[t]he term relevance at the discovery stage is broadly interpreted to include information which is not admissible at the trial if the discovery appears to be reasonably calculated to lead to the discovery of admissible evidence." Convertino v. DOJ, 565 F.Supp.2d 10, 12 (D.D.C. 2008); see also Burlington Ins. Co. v. Okie Dokie, Inc., 368 F.Supp.2d 83, 86 (D.D.C. 2005). "Therefore, with respect to a Rule 45 subpoena, '[a] request for discovery should be considered relevant if there is any possibility that the information sought may be relevant to the claim or defense of any party." In Re Denture, 292 F.R.D. at 123 (quoting Hesco Bastion Ltd. V. Greenberg Traurig, LLP, 2009 W.L. 5216932, at *4 (D.D.C. 2009)).

"Moreover, the general policy favoring broad discovery is particularly applicable where, as here, the court making the relevance determination has jurisdiction only over the discovery dispute [, i.e., as part of a "miscellaneous case,"], and hence has less familiarity with the intricacies of the governing substantive law than does the court overseeing the underlying litigation." Jewish War Veterans, 506 F.Supp.2d at 42 (citing, Flanagan v. Wyndham Int'l, Inc., 231 F.R.D. 98, 103 (D.D.C. 2005)). Indeed, a "court in such a situation should hence be cautious in determining relevance of evidence and in case of doubt should err on the side of permissive discovery." Flanagan, 231 F.R.D. at 103 (citing, Heat & Control, Inc., 785 F.2d 1017, 1024 (Fed. Cir. 1986)). The foregoing standards are applicable to third-party subpoenas served on federal agencies, as well. See Watts v. S.E.C., 482 F.3d 501, 508-09 (D.C. Cir. 2007) ("Rule 45 also supplies the standards under which district courts assess agency objections to a subpoena. The rule requires that district courts quash subpoenas that call for privileged matter or would cause undue burden.");

Northrop Corp., supra, 751 F.2d at 407. Finally, pursuant to F.R.C.P. 45(c)(1), a party moving to compel compliance with a subpoena is under an affirmative duty to "avoid imposing undue burden or expense on [the] person[s] subject to the subpoena . . ." Id.

## A.  The Production Requests Are Relevant to the SDFLA Action.

The fifteen (15) Production Requests contained in the Subpoena are highly relevant to the resolution of the SDFLA Action and have been carefully calculated to lead to the discovery of information that is likely to lead to the discovery of admissible evidence relating to the claims and/or defenses of the Parties. This is evident from both the scope and design of the Subpoena's parameters and the content of the Production Requests themselves.

With regard to the Subpoena's scope and parameters, Plaintiff purposefully included temporal-based limitations and content-based limitations. The Subpoena is limited in time to include responsive records during the "Relevant Time Period" of January 1, 2015 and December 31, 2018, Levitt Cert. at Ex. 1, which (1) spans the years in which risk adjustment data and capitated payments relevant to the Gainshare Agreement should have been submitted/issued, see, e.g., id. at Ex. 5 (Agreement to include, among other things, a "Gap Analysis using all applicable diagnosis and procedure codes from permissible encounters with dates of service July 1, 2016 through June 30, 2017 to generate an accurate Risk Score that will be applied to *2018 preliminary payments* . . . [and additional] services include . . . review[ of] Client's Management Data to arrive at an accurate *2015 Revised Risk Score* [and the] . . . perform[ance of an] . . . Analysis for 2015 to identify Incorrect Management Data"), and (2) takes into account CMS regulations and guidance that capitation payments are adjusted based upon "risk adjustment data submitted for items and services furnished during the [prior] 12 month period." 42 C.F.R. 422.310(g). See also, discussion, infra at 41-42. As to the Subpoena's content-based limitations, Plaintiff limited the records sought

to only those Medicare Advantage contracts between Humana and CMS which included, during the Relevant Time Period, MCCI attributed members, i.e., Humana Medicare Advantage enrollees who received medical services/items rendered/furnished by physicians contracted with the MCCI Entities. See Levitt Cert. at Ex. 1; Lieberman Dec. at ¶16-19.

Further, the records sought through each of the Subpoena's fifteen "Production Requests" all serve to provide information that will reveal, confirm or clarify whether the Mile High Gainshare Submissions were submitted by the MCCI Entities to Humana and by Humana to CMS; how much of this data was submitted from one entity to the other; what percentage of this data was ultimately rejected by Humana or CMS and why; the monetary value of the data submitted and accepted by CMS; and/or when and to whom (if anyone other than "Humana Inc.") the CMS capitated payments were paid. This information, moreover, is directly relevant to the resolution of the various Counts in the FAC, as such information plainly goes to, e.g., whether and how the Gainshare Agreement may have been breached by one or more of the Defendant Entities, the determination of the total direct compensatory damages at issue, which is relevant to all Counts.

Each Production Request's relevance is addressed with more specificity, below; however, for ease of reference, Plaintiff notes that the Production Requests may loosely be grouped into three categories: The first group, consisting of Production Requests 2 and 6, contain data files originating from and generated by Humana, which contain beneficiary-level data (i.e., PHI) from the MCCI Entities. Lieberman Dec. at ¶25. The second group, which includes Production Requests 1, 3, 5, and 7-9, consists of data files originating with CMS that contain summary information about risk adjustment data file acceptance or rejection and are exclusive of beneficiary-level data. Id. The third group, made up of Production Requests 4, and 10-15, include data files originating with CMS that were transmitted to Humana and contain beneficiary-level information. Id. It bears

noting that by seeking the various cumulative reports listed in many of the Production Requests, which are to be used, in part, to validate the integrity and completeness of the records produced by CMS, Plaintiff does not call into question CMS' veracity or motives; rather, the need to corroborate and verify the completeness of data produced by CMS arises from the non-negligible possibility that CMS may have responsive records scattered throughout different storage "locations" or with various CMS-contractors, which may inadvertently result in the agency's production of incomplete data sets. Id. at ¶32.

I.      *Group 1 – Files Originating with Humana that Contain Beneficiary-Level Data*

**Production Request 2** calls for RAPS Return Files. RAPS Return Files contain all Humana submitted diagnosis codes via RAPS Submittal Files (note: these codes are not HCCs) to CMS, with CMS-generated annotations indicating whether the Submittal Files contained errors. Id. at ¶26-27. Plaintiff will use these files to track the Mile High Gainshare Submissions' data from Humana transmittal to CMS acceptance. Id. at ¶27. **Production Request 6** calls for Encounter Data Services (EDS) Submittal Files. EDS Submittal Files contain encounter data records (EDR) and chart review records (CRR), the former of which lists all medical items or services rendered/furnished to a beneficiary and the latter of which includes corresponding risk adjustment eligible diagnoses or "delete" diagnosis codes for a beneficiary. Id. at ¶29. The "delete" code indicates whether a given diagnosis code for a given beneficiary had previously been submitted to CMS. Id. at ¶29-30. Because, by law, see, e.g., Levitt Cert. at Ex. 20 (CMS May 2018 Encounter Data Submission and Processing Guide at § 1.1), MAOs must submit risk adjustment data to CMS via EDR and CRR transaction records, *while also submitting the same data (in an abbreviated format) via RAPS files*,[7] Mile High will cross-reference the EDS Submittal Files with the RAPS

---

[7] As noted in the Summary of Facts and Procedural History, supra at 6-7, Encounter Data is file type utilized by CMS for the submission of risk adjustment data in the same way that RAPS

Return Files to determine how many of the diagnosis codes contained in the Gainshare Submissions was submitted by Humana to CMS. Lieberman Dec. at ¶29-30. It will also be used, as discussed below in connection with the requested MAO-004 Reports, to determine when the data was submitted to CMS. Id. at ¶30.

## II.        Group 2 – Files Originating with CMS that Contain Only Summary Information

Production Request 1 seeks FERAS Response Reports, which indicate whether a RAPS Submittal File was accepted or rejected by CMS' FERAS system. Id. at ¶31. These Reports will allow Mile High to account for all relevant Humana RAPS Submittal File submissions, when these submissions occurred and whether they were accepted by CMS. Id. This will aid Plaintiff in tracking the path and determining the results of the Gainshare Submissions and the Plaintiff has received all relevant files submitted by Humana to CMS. Id. Production Request 3 seeks RAPS Cumulative Plan Activity Reports. Id. at ¶32. These Reports provide a cumulative summary of the status of RAPS Submittal File submissions to CMS, including monthly totals of the status of all records submitted, organized by submitter ID and contract number. Id. Mile High will use these Reports to cross-verify the total number of RAPS Submittal File submissions to CMS by Humana and/or as a gap-filler, in case the agency has difficulty locating other relevant RAPS submittal data. Id. Production Request 5 calls for RAPS Transaction Summary Reports, which contain all transactions submitted by the MAO to CMS, whether accepted or rejected on a particular transmittal date to CMS. Id. at ¶33. Unlike the FERAS Response Reports referenced above, RAPS Transaction Summary Reports are RAPS-file specific for each run-date. Id. These Reports will assist Plaintiff in tracking the total number of RAPS Submittal File submissions, when they were made, and whether they were rejected. Id. All of the foregoing Reports will also be used to

---

Files are; however, EDS files have a distinctive format and tend to include more expansive data than do RAPS Files. See also Lieberman Dec. at ¶27-30.

corroborate/cross-verify other data produced by both CMS and the Defendant-Entities and to ensure more generally that Plaintiff has received all relevant data submitted by Humana to CMS. Id. at ¶31-33.

Production Request 7 calls for the production of Encounter Data Services (EDS) Response Data Files. EDS Response Data Files are file-level responses from CMS indicating whether an EDS Submittal File was accepted or rejected. Id. at ¶34. They will be used by Mile High to, among other things, determine whether it has received all accepted EDS Submittal Files from CMS and/or Humana, which will allow it to track the path/success of the Gainshare Submissions' data. Id. Production Request 8 seeks Encounter Data Front End System (EDFES) 227CA Acknowledgement Reports. Id. at ¶35. These records are unsolicited reports generated by CMS and transmitted to MAOs, indicating whether each EDR or CRR file has been accepted or rejected by CMS. Id. Among other information, these Reports will provide the unique "Internal Control Number" ("ICN") assigned to each encounter within an EDR file. Id. ICNs are of critical importance, as they will allow Plaintiff to efficiently link EDS data submitted by Humana to the output data later generated by CMS in connection with the same. Id. Production Request 9 calls for Encounter Data Processing System (EDPS) MAO-002 Encounter Data Processing Status Reports. MAO-002 Encounter Processing Status Reports provide accepted/rejected status of all accepted EDR/CRR submittals at both the claim and the "line" level, meaning the acceptance/rejection of individual diagnosis codes are reflected and not simply the status of the larger claim for services containing those diagnosis codes. Id. at ¶36. Reviewing these Reports will permit Plaintiff to determine – at the diagnosis code level – how many of the diagnosis codes contained within the Gainshare Submissions were accepted by CMS. Id.

### III.     Group 3 – Files Originating with CMS that Contain Beneficiary-Level Data

**Production Request 4** call for RAPS Transaction Error Reports. These Reports are generated for each RAPS Submittal File submitted by the MAO to CMS, listing the transactions from each such file that contained errors and identifying the type/basis for those errors. Id. at ¶37. Plaintiff will use these Reports to validate the integrity and completeness of the RAPS Submittal and Return Data Files received. Id. **Production Request 10** seeks EDPS MAO-001 Encounter Data Duplicates Reports, which list all submissions of duplicative encounter data. Id. at ¶38. Plaintiff will use these reports to delete duplicative encounter data to ensure an accurate analysis of the value of the EDR records to be reviewed. Id. **Production Request 11** calls for Medicare Advantage Prescription Drug System (MARx) Monthly Membership Report (MMR) Data Files. MARx MMR Data Files, generated by CMS on a monthly basis, list every Part C and Part D Medicare member for a given Medicare Contract, providing details about the payments and adjustments made by CMS for each. Id. at ¶39. MARx MMR Data Files *are the sole source from which CMS calculated risk scores for each beneficiary in a given plan may be secured*. Id. Thus, through these files, Plaintiff will be able to track enrollment of relevant beneficiaries, determine whether they've moved to another contract, and the magnitude of changes to the beneficiaries' risk score and premium payments by CMS, adjusted by the agency based upon receipt of new risk adjustment data. Id. This, plainly, will also assist Plaintiff in calculating percentage increase in capitated payments deriving from risk adjustment data supplied to the MCCI Entities by Mile High. Id.

**Production Request 12** seeks HICN to MBI Crosswalk Files. Section 501 of the Medicare Access and CHIP Reauthorization Act (MACRA) of 2015 "require[d] CMS to remove Social Security Numbers from Medicare ID cards and replace existing Medicare Health Insurance Claim Numbers (HICNS) with a Medicare Beneficiary Identifier (MBI)." CMS Social Security Removal

Initiative Bulletin, 2016 WL 3193412 (CHIP 5/5/16). "To assist MAOs . . . with the ability to determine or match their beneficiary population between HICN and MBI, MARx will generate and distribute a monthly crosswalk data file . . . [to be] created at the MAO/PDP Contract level [and] . . . sent monthly . . ." Ex. 21 to Levitt Cert. (CMS Announcement of the February 2018 Software Release (CMS 2/5/18)). Mile High will therefore use the HICN and MBI Crosswalk Files to link SSN-based beneficiary identifiers contained in data created before the commencement of the New Medicare Card Project to data created using only Medicare Beneficiary Identifiers. Lieberman Dec. at ¶40.

Production Request 13 seeks Risk Adjustment System (RAS) Phase III Version 3 MAO-004 Reports. MAO-004 Reports lists all diagnoses from CMS-accepted EDRs and CRRs and specifically identifies whether they are eligible for risk adjustment, i.e., a change in capitated payment amount. Id. at ¶41. Plaintiff will use the MAO-004 Reports in conjunction with the RAPS Return Data Files and EDS Submittal Files to determine the totality of incremental premium revenue received by Humana deriving from Mile High's Gainshare Submissions. Id. Making this determination is at the very heart of the SDFLA Action. Production Request 14 calls for the production of Risk Adjustment System (RAS) Part C Risk Adjustment Model Output Data Files. These data files show the HCCs used by the RAS system to calculate risk adjustment factors for each beneficiary. Id. at ¶42. Plaintiff can therefore use these data files to identify all HCCs credited by CMS to Humana deriving from the Gainshare Submissions. Id. Production Request 15 seeks Risk Adjustment System (RAS) Final Yearly Model Output Data Files (Part C). These data files indicate year end Medicare Advantage risk adjustment factors for each beneficiary enrolled in a given plan by aggregating and summarizing the monthly RAS Model Output Data Files. Id. at ¶43.

Plaintiff can use the yearly reports to ensure the integrity and completeness of the monthly data files it receives from CMS. Id.

**B. Plaintiff Took Reasonable Steps to Avoid Imposing an Undue Burden on CMS.**

As detailed at length above, see 14-20, supra, Mile High made best efforts to work with Humana to secure the records needed in order to obviate the need for the Subpoena as early as two-months prior to the filing of the SDFLA Action and, again, after filing of the Action but prior to service of the Subpoena, and was met with nothing more than unjustified resistance and unexplained reticence. Id. at 18-20. Likewise, Mile High made good faith and reasonable overtures – beginning on the very day the Subpoena was served – to CMS in an effort to preemptively mitigate agency burden, but was rebuffed time and again without sensible cause. See id. at 16-20. Plaintiff therefore submits that it has more than satisfied Rule 45's affirmative duty to take reasonable steps to avoid imposing an undue burden.

## Point 2

### CMS and Humana Have Failed to Raise Meritorious Objections to the Subpoena and the Court Should Therefore Grant the Motion to Compel.

Neither CMS nor Humana have raised meritorious objections. In light of this and because the evidence sought in Production Requests 1- 15 is relevant to the SDFLA Action, the Motion to Compel should be granted.

**A. CMS' Objections Should Be Overruled or Deemed Waived As Boilerplate.**

- **CMS Objection 1:** The Privacy Act "precludes release except pursuant to a . . . federal court order that directs the release of the records."

Per the above, CMS does not object on the ground that the Subpoena does not warrant disclosure under the Privacy Act; rather, CMS simply objects on the ground that no such order has yet issued. By way of this Motion to Compel, Plaintiff respectfully submits that, since the records sought through the Subpoena are relevant to the SDFLA Action, such an Order should so issue.

While the Privacy Act provides that disclosure of agency records is prohibited absent a court order, see 5 U.S.C. 552a(b)(11), the Act does not create a discovery privilege pursuant to which a party seeking discovery must demonstrate need before a court may issue an order for disclosure; instead, the relevancy standard of F.R.C.P. 26(b) governs the question of disclosure, as it would in the ordinary course of any discovery dispute. Laxalt v. McClatchy, 809 F.2d 885, 888-89 (D.C. Cir. 1987); see also In re England, 375 F.3d 1169, 1179-80 (D.C. Cir. 2004) (noting how in McClatchy, the D.C. Circuit "held that the Privacy Act did not prohibit disclosure of protected material in discovery, but . . . expressly *permitted* disclosure pursuant to the order of a court of competent jurisdiction" [and further noting that] McClatchy "conclude[ed] that the Privacy Act did not trump the normal discovery rules.") (internal quotations and citations omitted). Thus, "the Privacy Act is not a bar to a party obtaining materials 'through the normal discovery process and according to usual discovery standards.'" Rogers v. England, 246 F.R.D. 1, FN6 (D.D.C. 2007) (quoting McClatchy, 809 F.2d at 889). Should the Court find that, with respect to the Production Requests contained in the Subpoena, F.R.C.P. 26(b)'s relevancy standard has been met, an Order compelling compliance with the Subpoena will therefore satisfy § 552a(b)(11), permitting disclosure under the Privacy Act.

As discussed at length above, see supra, 22-29, Plaintiff has satisfied the relevancy requirement and, as such, this Court should issue an Order compelling compliance with the Subpoena pursuant to both F.R.C.P. 45(d) and § 552a(b)(11). Upon the issuance of such an Order, CMS Objection 1, will be rendered moot.

- **CMS Objection 2:** "We do not know how to comply with this provision [concerning the applicability of Other Applicable Privacy Law to data received by subpoenaing party as set forth in Agreed HIPAA Qualified Protective Order] . . . without doing a line by line inspection of all of the medical data you have requested to determine whether the release is consistent with this provision. This creates an enormous undue burden on the agency as the review would be time-consuming and costly."

CMS Objection 2 reflects that CMS has misconstrued the plain language of the HQPO

provision cited, Paragraph 7, see Levitt Cert. at ¶2, which reads:

> **Other Applicable Privacy Law.** Notwithstanding any provisions of this Protective
> Order to the contrary, in accordance with any applicable Federal, State, or local
> laws that afford heightened protection to certain categories of confidential health
> information, including but not limited to, records or diagnosis or treatment for
> alcohol or substance abuse, certain sexually transmitted diseases such as
> HIV/AIDS, mental health, and research pertaining to genetic testing, ***the party in***
> ***receipt of such information shall*** comply with the applicable Federal, State, or
> local law that affords heightened protection to such information.

The above-italicized language makes clear, that Paragraph 7 applies to a litigant in the SDFLA

Action who receives "certain categories of confidential health information." Id. It does not apply

to CMS. CMS Objection 2 is therefore without basis and should be overruled.

- ▪ **CMS Objection 3:** "We also believe that compliance with the subpoena is not practical
  within the time frames requested. We believe that compliance would be costly and would
  be an undue burden on the agency."

CMS Objection 3 may have been valid at the time it was made on the morning of March

13, 2019, but it is no longer. It was written to Plaintiff at a time at which the Subpoena's

compliance date was still, as notated on the Subpoena itself, March 13, 2019. See Levitt Cert. at

Ex. 1. The initial compliance date (i.e., the "time frames requested"), however, was later extended.

Id. at ¶19. In spite of this extension, CMS did not later reassert or extend the applicability of the

"not practical within the time frames requested" objection. Id. Nor did it request a further

extension. Id. Because CMS Objection 3 was tethered to the initial March 13, 2019 return date for

the Subpoena, it is – by its own terms – no longer operative. It should therefore be overruled as

moot by this Court.

Even assuming, <u>arguendo</u>, that CMS Objection 3 were still operative, it should still be overruled, as it is nothing more than a boilerplate or overly generalized objection. "As this [C]ourt has already noted on numerous occasions[,]" <u>Alexander v. F.B.I.</u>, 194 <u>F.R.D.</u> 299, 302 (D.D.C.),

> The party objecting to discovery bears the burden of showing why discovery should not be permitted. A party objecting to a document request must include the reasons for the objection. This requirement enables the requesting party to evaluate and determine whether to challenge the objection raised. When faced with general objections, the applicability of which to specific document requests is not explained further, this Court will not raise objections for the responding party, but instead will overrule the responding party's objections on those grounds.
>
> [<u>Convertino</u>, 565 <u>F.Supp.2d</u> at 12 (internal quotations, punctuation and citations omitted for ease of reading); <u>see</u> <u>also</u> <u>Alexander</u>, 194 <u>F.R.D.</u> at 302, <u>supra</u>; <u>Klayman v. Judicial Watch, Inc.</u>, 2008 <u>WL</u> 11394169, *3 (D.D.C. 2008) ("This Court is of the opinion that 'pat, generic, non-specific objections, intoning the same boilerplate language, are inconsistent with both the letter and the spirit of the Federal Rules of Civil Procedure.'") (<u>quoting</u> <u>Obiajulu v. City of Rochester, Dep't of Law</u>, 166 <u>F.R.D.</u> 293, 295 (W.D.N.Y. 1996)).]

Here, assuming, <u>arguendo</u>, that CMS' March 13, 2019 CMS Objection 3 is still applicable, it is plain that the agency failed to provide a single reason that would tend to justify the archetypal boilerplate objection proffered of "undue burden on the agency." Further to this point, it is entirely unclear whether the undue burden is applicable to one, two or all of the Production Requests within the Subpoena.

Under such circumstances, the District for the District of Columbia has not only overruled objections but has deemed them "waived." In <u>Athridge v. Aetna Cas. And Sur. Co.</u>, 184 <u>F.R.D.</u> 181 (D.D.C. 1998), the court articulated the following rationale for doing so in ruling on a Motion to Compel pursuant to Rule 45:

> The Federal Rules speak directly to the necessity to state objections with specificity with regard to interrogatories. Rule 33 provides that '[a]ll grounds for an objection to an interrogatory shall be stated with specificity' and that '[a]ny ground not stated in a timely objection is waived.' Although Rule 34 governing production of documents does not contain identical language, 'no reasons exists to distinguish between interrogatories and requests for production' as to the requirement for

specificity and the risk of waiver.' Indeed . . . the advisory committee notes to the 1970 amendment to Rule 34 states that the 'procedure provided in Rule 34 is essentially the same as that in Rule 33.' With no specific objection lodged and the general objection insufficient, [non-movant's] relevance objections to Requests for Production . . . must fail.

Id. at 191-92, 199. (internal citations omitted); accord Moore v. Napolitano, 2009 WL 2450280, *4 (D.D.C. 2009) (quoting Athridge in noting that boilerplate objections are "really no objection at all . . ."). Here, CMS baldly states that it "believe[s] that compliance would be costly and would be an undue burden on the agency." Such an objection is content-free and so non-specific as to be "really no objection at all" per this District's precedent. For these reasons, to the extent the Court should find that CMS Objection 3 was not tied to the Subpoena's initial return date (and overrule it on that ground), CMS Objection 3 should still be deemed waived or overruled as boilerplate.

Further, it is well-settled in this Circuit that "inconvenience occasioned by compliance with [a] subpoena" – even inconvenience borne by the government – "is not a sufficient reason to quash" or to deny a motion to compel. Westinghouse Elec. Corp. v. City of Burlington, Vt., 351 F.2d 762, 767 (D.C. Cir. 1965); see also Northrop Corp. v. McDonnell Douglas Corp., 751 F.2d 395, 407 (D.C. Cir. 1984) ("[w]hile we fully recognize the burden of imposing on a non-party the effort and expense of discovery, particularly when the expense will be borne by the taxpayers, we also recognize that 'the paramount interest of the Governing in having justice done between litigants in Federal courts militates in favor of requiring a great effort on its parts to produce any documents relevant to fair termination of the[e] litigation.'") (quoting, in part, Westinghouse, 351 F.2d at 407). Here, at best, CMS' objection is nothing more than a non-specific complaint about a hypothetical inconvenience it believes it might suffer should it comply with the Subpoena. This is not a sufficient basis for an objection or to quash.

- **CMS Objection 4:** "Finally, we believe that Humana should be given an opportunity to object on the grounds that some of the information might be considered to be proprietary."

33

CMS Objection 4 is moot and should be overruled as such, as Humana has been put on notice of the Subpoena and has objected. See 17-18, supra.

- **CMS Objection 5:** "The following should be considered to be additional objections to your subpoena. As we have previously discussed, we are waiting for an Order from the Court related to the Privacy Act and clarification regarding the production of records that have heightened privacy protection. After such an Order is obtained, we can discuss what can reasonably be produced by CMS without an undue burden and what documents that the defendant in this action may seek to claim are proprietary. Therefore we will not be producing any documents this week."

CMS Objection 5 is largely duplicative of CMS Objections 1 and 3 and Plaintiff responds to it in kind. For the reasons stated above, supra at 30, so long as this Court determines that the Production Requests seek information relevant to the SDFLA Action within the meaning of F.R.C.P. 26(b), the Privacy Act poses no impediment to disclosure. Further, as discussed in the previous section, see supra at 29-30, fact and content-free objections that a discovery request may create an "undue burden" are impermissibly over-generalized or boilerplate and should be overruled or deemed waived as such.

We would direct the Court's attention, moreover, to the agency's express determination to decline to provide any modicum of detail as to what, precisely, is burdensome about complying with the Subpoena, despite Plaintiff having expressly requested that CMS do so, in a good faith effort to proactively and preemptively address agency burdensomeness concerns (founded or unfounded). More specifically, and as described in greater detail above, in response to CMS' objection(s) on the basis of burdensomeness, Plaintiff wrote to CMS' counsel, asking whether the agency is "able to provide [Plaintiff] with any specificity on the issue of burdensomeness? It seems to [Plaintiff] that it would be sensible for CMS to provide [Plaintiff] with some detail as to the basis for this objection now rather than addressing it for the first time in an Opposition to a Motion to Compel (should we need to file one). With detail as to the underlying reasons for the purported

burdensomeness, we can work to potentially tailor a narrower set of requests or perhaps find[] a mutually agreeable solution that would lessen the burden. Kindly advise." <u>Levitt Cert.</u> at ¶24-25. In response, CMS stated: "[CMS] will see if [it] can get you some more detail, but we need a new order from the Court before we can go forward." <u>Id.</u> at ¶25. Roughly three-months hence, CMS has provided Plaintiff with no additional detail. <u>Id.</u>

Having identified the baselessness of CMS' objections and its unreasonable unwillingness to cooperate in the discovery process, Plaintiff now respectfully asks this Court to compel the agency's compliance with the Subpoena so that it may move the SDFLA Action forward.

<b>B. <u>Humana's Objections Should be Overruled or Deemed Moot.</u></b><br>I. <b><i><u>Humana Has No Standing to Quash the Subpoena</u></i></b>

Humana's Objections are predicated on the false premise that Humana has standing to challenge the Subpoena in the first instance.[8] It does not. "A party generally lacks standing to challenge a subpoena issued to a third party absent a claim of privilege, proprietary interest, or personal interest in the subpoenaed matter[, and, as such,] [a] motion to quash or for a protective order should [instead] generally be made by the person from whom the documents or things are requested." <u>Washington v. Thurgood Marshall Academy</u>, 230 <u>F.R.D.</u> 18 (D.D.C. 2005); <u>see also</u> <u>9A Wright & Miller, Federal Practice & Procedure</u> § 2459 (2017) ("Ordinarily a party has no standing to seek to quash a subpoena issued to someone who is not a party to the action, unless the objection party claims some personal right or privilege with regard to the documents sought."); <u>Goldstein v. F.D.I.C.</u>, 494 <u>B.R.</u> 82, 85–86 (Bank. D.D.C. 2013); <u>In re Shelton Federal Group</u>, 2018 <u>W.L.</u> 4482560, at *1-2 (Bank. D.D.C. 2018). Records or information may be considered

---

[8] While Humana did not do so in writing, counsel did telephonically express the MAO's belief that at least some of the records at issue contain proprietary Humana information. <u>See</u> <u>Levitt Cert.</u> at ¶30. Properly raised or not, the question of standing is relevant to the determination of whether Humana's written objections are proper or permissible.

proprietary for purposes of a discovery disclosure analysis only where disclosure of the information "would unfairly harm the disclosing party's ability to compete in the marketplace" and the party to whom the information will be disclosed is a "direct competitor" of the disclosing party. See Albany Molecular Research, Inc. v. Schloemer, 274 F.R.D. 22, 25 (D.D.C. 2011) (citing Falicia v. Advanced Tenant Serv., Inc., 235 F.R.D. 5, 7 (D.D.C. 2006)).

Here, the records sought deal with Humana enrollees' health-related data and are in an (effectively) open-source file/data format/type created by CMS or a CMS-contractor, which file/data format/type are used by every MAO in the nation. Lieberman Dec. at ¶24.[9] See Medicare & Medicaid Guide P 160501 (C.C.H.), 2013 WL 11115122, at *120 ("Risk Adjustment Payment Process 120. Operations . . . CMS requires Medicare Advantage plans to collect hospital inpatient, hospital outpatient, and physician risk adjustment data and submit the data to CMS . . . plans submit the data using the Risk Adjustment Processing System (RAPS) format and provide the five required data elements in the [below-shown] . . . Table . . ."); see also https://www.csscoperations.com/internet/cssc4.nsf/docsCat/CSSC~CSSC%20Operations~Medic are%20Advantage%20Encounter%20Data%20and%20RAPS%20Data~Resources?open&expan d=1&navmenu=Medicare^Advantage^Encounter^Data^and^RAPS^Data|| (CMS/CMS-contractor webpage including open source risk adjustment data tools for the creation of CMS compliant risk adjustment data file types for delivery to CMS, such as RAPS Reports) (last accessed 7/2/19); Ex. 22 to Levitt Cert. (Medicare Advantage & Part D Communications Handbook at 1 ("Organizations contact CMS' approved Network Service Vendors to establish connectivity with [CMS contractor's] secure network. Medicare Advantage Organizations

---

[9] We would note that the Protective Order specifically provides that no item shall be deemed confidential simply by virtue of its "file format, extension-type, organization, layout, design or structure, in which [data] . . . is maintained or stored." Exhibit 3 to Levitt Cert. at ¶7.

(MAOs) and other entities submit data over the CMS Extranet, a secure, encrypted, virtual private Network.")). The file types themselves are thus non-proprietary and, moreover, a given enrollee's health-related risk adjustment data – if disclosed publicly – could not be used to any competitor's commercial advantage. Indeed, applicable privacy law, including HIPAA, would make it illegal for these competitors to take and make use of the data. See, e.g., 45 C.F.R. 164.508(a)(1) ("Except as otherwise permitted . . . a covered entity may not use . . . protected health information without . . . authorization . . ."). But even if it didn't, Plaintiff fails to see how patient health data – which will not reveal Humana's business strategies, confidential technological capabilities/innovations, intellectual property or other business-related information – could at all be weaponized by a direct competitor in the marketplace. Further, we think it is self-evident that a multi-billion dollar MAO involved in the business of insuring patients cannot be plausibly described as competing in the same marketplace as a small data analytics firm, which is (obviously) not in the business of insuring patients. Lieberman Dec. at ¶7-9. Additionally, as discussed in greater detail below, the records produced will be subject to not one but *two* (currently) in-force Protective Orders, carefully constructed to maintain the confidentiality of records produced through the discovery process in the SDFLA Action – so there is no serious risk of disclosure of the data to persons/entities outside of the confines of the litigation.

Perhaps the most compelling evidence that the Subpoena does not seek proprietary information, however, is that Humana expressly agreed to permit Mile High *direct access to all records* produced by CMS – as reflected in the language of the carefully negotiated Protective Order[10] – *after Humana had received and reviewed a copy of the Subpoena*, i.e., after it was on

---

[10] Specifically, the Protective Order provides that the "Parties have agreed that things produced by the United States Department of Health and Human Services ('HHS') and all agencies within HHS, including, but limited to, [CMS] ('HHS Material') shall without the need for further designation be considered 'Confidential' pursuant to . . . this Order . . . [and f]or the avoidance of

notice of precisely the sorts and scope of records Plaintiff intended to seek from CMS. <u>Compare</u> <u>Ex.</u> 1 to <u>Levitt Cert.</u> with <u>Ex.</u> 3 and 19 to <u>Levitt Cert.</u> Had Humana legitimately considered Mile High a direct competitor and/or feared that the disclosure of the data to Mile High would "unfairly harm [its] ability to compete in the marketplace[,]" <u>Albany Molecular</u>, 274 <u>F.R.D.</u> at 25, it would never have agreed to allow such access. Indeed, the Protective Order indicates as much insofar as it, on the one hand, (1) designates CMS produced records as "Confidential Information," which is not defined to include trade secrets or proprietary information, while, on the other, (2) it expressly prohibits designating CMS produced records as "Confidential Attorneys Only" information, the latter of which information-type is, in fact, ***defined to mean*** information that is "***a trade secret [or information that] would reveal proprietary information, data or methodologies [or otherwise] . . . undermine the producing party's competitive posture in future negotiations, bidding, or other business dealings*** . . ." <u>Levitt Cert.</u> at <u>Ex.</u> 4 (emphasis supplied). In short, the records sought through the Subpoena cannot be seriously characterized as proprietary and, as such, Humana has no standing to quash their production. All of the Humana Objections should therefore be overruled.

Even if this Court should determine that Humana has standing to quash the Subpoena because the information sought is proprietary, however, this would still not confer standing on the MAO with respect to objections made on the basis of burdensomeness because, logically, ***Humana*** cannot be burdened by work to be performed by ***CMS***. <u>See</u> <u>F.R.C.P.</u> 45(d)(3)(A)(iv) (making plain that a "person" may move to quash if that (same) "person" has been subjected to an undue burden). And even if Humana could somehow avail itself of CMS' "burden," the objection would still be subject to dismissal because CMS' burdensomeness objection is impermissibly boilerplate. <u>See</u> 29-30, <u>supra</u>. Relatedly, as detailed in the Statement of Material Facts, Mile High made a good

---

doubt, per the foregoing sentence, HHS Material shall not be designated or deemed 'Confidential Attorneys Only' under this Order." <u>Levitt Cert.</u> at <u>Ex.</u> 3.

faith effort to secure these files from Humana prior to ever serving the Subpoena and Humana resisted providing them without reasonable or just cause. See supra at 14-18. To now argue, on **CMS' behalf**, that **CMS** will be burdened by the production of records that Humana **could have and should have** produced itself, is a hypocrisy worthy of the Court's consideration.

II.     ***Humana's Objections Are Mooted Or Rendered Superfluous by the Protective Order***

Because "the quashing of a subpoena is an extraordinary measure, and is usually inappropriate absent extraordinary circumstances . . . a court should loathe to quash a subpoena if other protection of less absolute character is possible." Flanagan v. Wyndham Intern. Inc., 231 F.R.D. 98, 102 (D.D.C. 2005); accord U.S. Dep't of the Treasury v. Pension Benefit Guaranty Corporation, 301 F.R.D. 20, 25 (D.D.C. 2014). As such, where a protective order applicable to the records in dispute is already in place, as is the case here, courts will typically deny a motion to quash because the existence of a protective order, "designed to protect and prevent public disclosure of confidential and sensitive business information[,]" means "there is little or no threat that [the disclosing party's] financial health will be impacted by the document disclosures or that their direct competitors would gain unfair access to the confidential information and use it against the company, since the requested information will be fully protected from disclosure or use outside the ongoing litigation." Albany Molecular, 274 F.R.D. at 26-27; see also Hillerich & Bradsby Co. v. MacKay, 27 F.Supp.2d 124, 125, 127 (D.D.C. 1998) (denying motion to quash where protective order in place even after determining that the information at issue was trade secret, since protective order would "safeguard the confidentiality of the information" in dispute).

Humana made its objections prior to the entry of the Protective Order. Now that the Protective Order is in place, an Order which plainly and expressly addresses the protection and handling of any information that might be produced by CMS, see Ex. 3 to Levitt Cert. at, e.g., ¶1-

3, these objections serve no purpose, as the Protective Order will safeguard the confidentiality of the records at issue. Under these circumstances, objections based on fear of financial harm must give way to the law's clear mandate to "err on the side of permissive discovery." <u>Flanagan</u>, 231 <u>F.R.D.</u> at 103. The Humana Objections should be overruled.

### III.   ***The Humana Objections Are, On Their Face, Without Merit***

In the event this Court should determine that Humana has standing to object to the Subpoena and that the Humana Objections have not been rendered moot as a result of the entry of the Protective Order, this Court should still overrule them. Humana Objections 1 – 4, excepting a portion of Humana Objection 1 (which alleges undue burden), are an attack on the breadth of the Subpoena's scope. As discussed below, this attack stems from Humana's fundamental misunderstanding of both the Medicare Advantage risk adjustment data intake process and of the Gainshare Agreement.

- **Humana Objection 1:** "[T]he relevant time period, which is overly broad, unduly burdensome, and calls for the productions of several years of information exchanged between Humana and CMS having nothing to do with the claims at issue in this litigation. The Gainshare Agreement has a retroactive effective date of January 9, 2017, and this case focuses on four discrete submissions to CMS between January 2017 through May 2018. Because the Gainshare Agreement did not even take effect until January 9, 2017 and the only relevant submissions occurred between that date and May 2018, other CMS submissions before and after those dates are not relevant to Mile High's claims. As a result, we request that you narrow the scope of the subpoena to include any information exchanged between Humana and CMS (and vice versa) prior to January 9, 2017 and after May 4, 2018."

"Similar to relevancy, a challenge that the subpoena is overly broad is not a reason for quashing a subpoena under Rule 45, but is nonetheless a reason to quash a subpoena as beyond the scope of allowable discovery under Rule 26." <u>In re Shelton</u>, <u>supra</u>, 2018 <u>W.L.</u> 4482560, at \*3. Here, the crux of Humana Objection 1 is that the Subpoena's "Relevant Time Period" – running from January 1, 2015 and ending on December 31, 2018 – is overbroad in that it calls for the

production of records that could not possibly include data relevant to the SDFLA Action.[11] This argument is deeply flawed because it neither takes into account the clearly structured timing, as prescribed by regulation and regulatory guidance, for MAOs' submission of risk adjustment data to CMS nor the temporal span of the Gainshare Agreement. The Subpoena's Relevant Time Period, on the other hand, does both and does so in order to capture all conceivably relevant data exchanges between CMS and Humana pursuant to CMS regulation/regulatory guidance and the Gainshare Agreement, as further illustrated below.

To begin with, by Medicare Advantage regulation, "[r]isk adjustment factors for each payment year are based on risk adjustment data submitted for items and services furnished during the 12-month period before the payment year that is specified by CMS. As determined by CMS, this 12-month period may include a 6-month data lag that may be changed or eliminated as appropriate. CMS may adjust these deadlines, as appropriate." 42 C.F.R. 422.310(g) ("Deadlines for submission of risk adjustment data."); Ex. 23 to Levitt Cert. (CMS issued "Risk Adjustment 101 – Participant Guide" manual, noting that "Medicare risk adjustment is prospective, meaning diagnoses from the previous year and demographic information are used to predict future costs and adjust payment."). Thus, as noted in the FAC, see, e.g., ¶30, this means that, as a general proposition, a risk adjustment submission for a given "Payment Year" relates to risk adjustment data pertaining to and collected in the year prior. It is for this reason (among others) that, by way of illustration but not limitation, the Gainshare Agreement provides:

> The Gap Analysis using all applicable diagnosis and procedure codes from permissible encounters with dates of service July 1, 2016 through June 30, 2017 to generate an accurate Risk Score that will be applied to **2018 preliminary payments** . . . *PY2016 Risk Score Related Services.* The services include i) reviewing Client's

---

[11] For the avoidance of doubt, we repeat our position that Humana has no standing to quash the Subpoena on the basis of **CMS'** purported/hypothetical burden, which purported/hypothetical burden was articulated in an impermissibly vague and boilerplate fashion. See 35-39, supra,

> Management Data to arrive at an accurate ***2015 Revised Risk Score***; ii) performing a ***Gap Analysis for 2015 to identify Incorrect Management Data*** . . .

<u>Levitt Cert.</u> at <u>Ex.</u> 5 at pp 2, 4 (emphasis supplied). Moreover, one of the principal purposes of the Gainshare Agreement was to identify **new Management Data** or ***correct previously submitted Management Data***. <u>See</u>, <u>e.g.</u>, <u>id.</u> at ¶4a, 4b, and 4c. Determining whether "Incremental Premium Revenue" was generated by the Gainshare Submissions therefore necessarily requires the review of risk adjustment data submitted by Humana both prior to and after the execution of the Gainshare Agreement. The necessity for data within the specified date range for resolving the central dispute of this litigation – whether there was an upward adjustment in Incremental Premium Revenue as a result of Mile High's efforts – could not be more plain.

In light of the above and the date range of the four Gainshare Submissions – which include a "Gap Analysis-PY2016 Post-Final for Reconciliation," a "Gap Analysis-PY2016 March Submission," a "Gap Analysis-2017 September Submission," and a January 2018 Submission – the Subpoena's Relevant Time Period (1/1/15 through 12/31/18) is entirely justified. Narrowing the temporal scope of the Subpoena as Humana seeks to do per its first Objection, on the other hand, would preclude Plaintiff's ability to determine and prove whether any of the MCCI Entities (or some other entity) received upwardly adjusted Incremental Premium Revenue as a result of Mile High's work under the Gainshare Agreement. Because the Relevant Time Period captures records relevant to the SDFLA Action, Humana Objection 1 should be overruled.

- **Humana Objection 2:** "The second objection we have is with respect to Mile High's request for documents related to Contract Nos. H4510 and H5216. These contracts were not considered by Wakely and we do not believe that they are relevant to the gainsharing analysis that is at issue in this litigation. You have previously stated that Contract H5415 was merged into Contract H5216 and that Contract H4510 was consolidated into Contract H2649 on 1/1/2016. Given that it is your contention that both of these contracts were consolidated and/or merged into Contracts H5216 and H2649 well in advance of any of the submissions at issue, we see no relevance in seeking documents related to those contracts.

42

Any information relevant to the submissions between January 2017 and May 4, 2018 would be contained in the materials related to Contracts H5216 and H2649."

Humana Objection 2 reflects the same misunderstanding of the relevant time period demonstrated in Humana Objection 1 in that it is predicated on the false premise that the only information relevant to the SDFLA Action within CMS' possession is that which falls within the "January 2017 and May 4, 2018" time frame. For an explanation as to why this is incorrect, Plaintiff directs the Court's attention to the previous section of this brief and submit that Humana Objection 2 should be overruled on the basis of the same.

If the Subpoena's Relevant Time Period is applied to the MAO Target Contracts referenced in Humana Objection 2, these Contracts become entirely relevant to both the SDFLA Action and the Wakely Report. In either event, Humana's reliance on the scope of the Wakely Report as a basis to object is misplaced, as that Report dealt exclusively with the March 2017 Submission, which was one among several Gainshare Submissions made pursuant to the Gainshare Agreement at issue in the SDFLA Action. See Levitt Cert. at Ex. 4 at ¶49, 78, 88. For these reasons, Humana Objection 2 should be overruled.

- **Humana Objection 3:** "[T]he individual production requests as seek[] a vast amount of documents and information that have nothing to do with MCCI's patients or the claims at issue. Without getting into every individual requests, several of the requests seek RAPS Return Files, RAPS Cumulative Plan Activity Reports, RAPS Transaction Error Reports, and RAPS Transaction Summary Reports for the Medicare Advantage contracts identified in the Subpoena. (*See, e.g.,* Production Requests Nos. 2-5) Compliance with these requests would result in the production of a huge range of Humana patient information and claims data having nothing to do with the MCCI claims information at issue in this litigation. Compliance with the requests as drafted would result in the production of risk adjustment, encounter data, and plan payment data files for thousands and thousands of Humana claims that have nothing to do with this litigation, MCCI, or Mile High."

As best as can be gleaned from the above, by way of Humana Objection 3, Humana objects to every document request in the Subpoena to the extent it may include "patient information and claims data having nothing to do with the MCCI claims information at issue in this litigation."

43

There is a HIPAA Qualified Protective Order already in place, in addition to the Protective Order (which reaffirms and enhances those protections set forth in the HQPO), see Levitt Cert. at Ex. 2 and 3, and Mile High, as a healthcare data analytics firm, maintains the highest levels of data security. See Lieberman Dec. at ¶11-13. Plaintiff has and will continue to abide by the Protective Orders and, although Humana may not, Plaintiff has every confidence in the Southern District of Florida's ability to enforce the privacy protections contained therein (which, incidentally, are there to protect Plaintiff's interests as well). Moreover, no patient or beneficiary-level data whatsoever is sought through Production Requests 2, 4, 6, 8 and 9, Lieberman Dec. at 25-27, 37, 29-30, 35-36, and, likewise, a number of the file-types listed in Humana Objection 3, including the "RAPS Cumulative Plan Activity Reports, RAPS Transaction Error Reports, and RAPS Transaction Summary Reports[,]" are PHI-free. Id. at ¶32, 37, 33. To the extent Humana Objection 3's primary concern is maintaining the privacy and integrity of patient data produced in response to the Subpoena, it is unfounded in both law and fact.

With regard to the production of risk adjustment data pertaining to non-MCCI attributed members, as catalogued above, we have made multiple and earnest efforts from the day the Subpoena was first served to dialogue and work with CMS to "pre-subset" the records sought in order to cull them of non-MCCI data, but these good faith and repeated overtures to the government have, unfortunately, fallen upon deaf ears. See Ex. 11 to Levitt Cert. at 2 (stating, in the Letter to CMS, that: "Mile high is willing and uniquely able to work collaboratively with CMS to narrow the scope of the Production Requests . . . Additionally, Mile High, as a highly sophisticated data analytics firm, can, in relatively short order 'subset' the records requested through the Production Requests, which records will inevitably contain beneficiary-data for non-MCCI-Entities, in order to cull only those data relevant to the Action[.]"). Moreover, the reason

Plaintiff decided to fashion the scope of the Subpoena to include data from all MAO Target Contracts instead of including only MCCI Entity attributed members was to preemptively reduce the potential agency burden compliance with the Subpoena may cause, as leaving the subsetting work entirely to CMS could prove time-consuming for it. Lieberman Dec. at ¶20-21. Even now, should the Court grant this Motion, Mile High is ready and able to assist CMS in pre-subsetting the data, having already written computer code precisely for this purpose. Id. at ¶22.

Humana (and CMS) cannot, on the one hand, decry the (potential) burdensomeness of compliance with the Subpoena on the one hand while simultaneously criticizing Plaintiff's overt efforts to allay that (potential) burdensomeness on the other. We ask that this Court not permit Humana and/or CMS to intentionally create such an artificial "Catch-22" for Plaintiff, as part of a transparent attempt to avoid compliance (to CMS' benefit) and thereby stymie Plaintiff's ability to prosecute its case (to Humana's benefit).

## CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that this Court compel CMS to comply with the Subpoena.

Respectfully submitted,

**FRIER & LEVITT, LLC**

Jonathan E. Levitt, Esq. (219207)
Jason N. Silberberg, Esq. (*pro hac vice admission pending*)
84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile: (973) 618-0650
jlevitt@frierlevitt.com
jsilberberg@frierlevitt.com

Dated: July 18, 2019

**THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **IN _RE_ MOTION TO COMPEL DEPARTMENT OF HEALTH AND HUMAN SERVICES, CENTERS FOR MEDICARE AND MEDICAID SERVICES TO COMPLY WITH SUBPOENA FOR RECORDS**<br><br>Mile High Healthcare Analytics, LLC,<br><br>2373 Central Park Blvd., Suite 100<br>Denver, CO 80238,<br><br>            Movant,<br>    v.<br><br>U.S. Department of Health and Human Services, Centers for Medicare and Medicaid Services,<br><br>Office of the General Counsel<br>200 Independence Ave, S.W.<br>Washington, D.C. 20201,<br><br>            Third-Party Non-Movant. | **MISC. CASE NO.:** |
| Mile High Healthcare Analytics, LLC,<br><br>            Plaintiff,<br><br>    v.<br><br>Medical Care Consortium Inc., Medical Care Consortium, LLC, MCCI Group Holdings, LLC, MCCI Holdings, LLC, Conviva Care Solutions, LLC, and Humana Inc.,<br><br>            Defendants. | **No. 1:18-cv-22374-DPG**<br>**Pending in the Southern District of Florida** |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing document was served on counsel of record for Medical Care Consortium, Inc., Medical Care Consortium, LLC, MCCI

Group Holdings, LLC, MCC Holdings, LLC, Conviva Care Solutions, LLC, Humana, Inc., and the Department of Health and Human Services, Centers for Medicare and Medicaid Services, listed on the Service List below by way of overnight delivery (via FedEx).

Respectfully submitted,

**FRIER & LEVITT, LLC**

Jonathan E. Levitt, Esq. (219207)
Jason N. Silberberg, Esq. (*pro hac vice admission pending*)
84 Bloomfield Avenue
Pine Brook, NJ 07058
Telephone: (973) 618-1660
Facsimile: (973) 618-0650
jlevitt@frierlevitt.com
jsilberberg@frierlevitt.com
*Attorneys for Plaintiff*

Dated: July 18, 2019

## SERVICE LIST

Mile High Healthcare Analytics, LLC v. MCCI Group Holdings, LLC et al.

Jason Daniel Joffe, Esq.
Squire Patton Boggs, LLP
1900 Phillips Point West
777 South Flagler Drive
West Palm Beach, Florida 33401
jason.joffe@squirepb.com
(561) 650 7284
*Attorneys for Defendants MCCI Holdings, LLC,*
*MCCI Group Holdings, LLC, Medical Care Consortium, LLC and Humana, Inc.*

Francesco A. Zincone, Esq.
Armas Bertran Pieri. LLC
4960 SW 72nd Ave, #206
Miami, Florida 33155
fzincone@armaslaw.com
(305) 661-2021
*Attorneys for Conviva Care Solutions, LLC, and Medical Care Consortium, Inc.*

Howard H. Lewis, Esq.
Office of General Counsel, Region IV
Department of Health and Human Services, Centers for Medicare and Medicaid Services
61 Forsyth Street, S.W., Suite 5M60
Atlanta, GA 30303-8909
Howard.Lewis@hhs.gov
*Counsel for CMS*

**Additional Copy to CMS Sent to:**
Department of Health and Human Services, Centers for Medicare and Medicaid Services
Office of Legal Resources
200 Independence Avenue, S.W., Room 700E
Washington, D.C. 20201